ALAN F. AND KATHLEEN W. SEGAL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; RICHARD K. AND LOIS L. JANGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Segal v. Commissioner
Docket Nos. 13786-83, 41167-84, 7647-85, 36915-85, 41523-85, 41524-85, 365-87, 366-87, 37553-87, 32364-88
United States Tax Court
T.C. Memo 1992-390; 1992 Tax Ct. Memo LEXIS 410; 64 T.C.M. (CCH) 99; July 13, 1992, Filed *410 For Petitioners: Theodore A. Sinars and Randall G. Dick. For Respondent: John J. Comeau, William G. Merkle, and James Cascino. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge D. Irvin Couvillion pursuant to section 7443A(b)(4) [1] and Rules 180, 181, and 183. The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: These consolidated cases were selected as test cases for the partnership Regina Associates. [2] Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Alan F. and Kathleen W. Segal -- docket Nos. 13786-83, 41167-84, 41524-85, and 366-87
*411 Additions to Tax
Year
Deficiency Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1979
$ 16,735.00
--
--
--
1980
42,717.00
--
--
--
1981
25,038.10
--
--
--
1982
237,745.00
$ 11,887
[1]
$ 23,775
Richard K. and Lois L. Janger -- docket Nos. 7647-85, 36915-85, 41523-85, 365-87, 37553-87, and 32364-88
Additions to Tax
Year
Deficiency Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1979
$ 283,952.22
--
--
--
1980
441,756.00
--
--
--
1981
337,070.00
$ 16,854.00
[1]
--
1982
1,381,227.00
69,061.00
[1]
$ 138,123
1983
589,061.00
31,414.00
[1]
147,265
1984
270,824.00
13,541.20
[1]
67,706
*412 In notices of deficiency to petitioners Alan F. and Kathleen W. Segal, respondent determined that, for 1981 and 1982, petitioners were liable for additional interest under section 6621(c). In notices of deficiency to petitioners Richard K. and Lois L. Janger, respondent determined that, for 1981, 1982, 1983, and 1984, petitioners were liable for additional interest under section 6621(c). Respondent, in amended answers, alleged that Regina Associates was not engaged in an activity for profit, and that petitioners were not entitled to any deductions from the partnership beyond those allowed under section 183. Respondent further asserted additions to tax under section 6659 against petitioners Alan F. and Kathleen W. Segal for 1981 and 1982 and additional interest under section 6621(c) for 1979 and 1980. Also by amendment to answer, respondent asserted additions to tax under section 6659 against petitioners Richard K. and Lois L. Janger for 1981, 1982, 1983, and 1984 and additional interest under section 6621(c) for 1979 and 1980. This Court must decide: (1) Whether Regina Associates (the partnership) acquired an ownership interest, as opposed to a gross receipts and net profits *413 participation interest, in the movie "North Dallas Forty"; (2) whether a promissory note executed by the partnership represented bona fide indebtedness for a portion of the purchase price of the movie; (3) whether, under section 465, the note is includable in the partnership's basis for the movie; (4) whether the partnership was not engaged in an activity for profit; (5) whether the partnership properly depreciated the movie or its interest in the movie over a useful life of 3 years; (6) whether petitioners are entitled to an investment credit with respect to the movie; (7) whether the partnership properly deducted certain miscellaneous expenses for 1979, 1980, and 1982; (8) what is the proper amount of the partnership's basis for the movie or its interest in the movie; and (9) whether petitioners are liable for the additions to tax and additional interest. FINDINGS OF FACT Some of the facts were stipulated and are so found. Petitioners were residents of the State of Illinois at the time their petitions were filed. Petitioners filed joint individual income tax returns for the years at issue. Petitioners Alan F. Segal and Richard K. Janger are attorneys. During 1979, they were *414 partners in the law firm of Levenfeld and Kanter. One of their partners in the law firm was an individual named Calvin Eisenberg (Mr. Eisenberg). The firm subsequently became Levenfeld and Eisenberg. Mr. Eisenberg is a tax attorney. In his practice, he developed significant expertise in investments in motion pictures. During 1978, various partnerships organized by Mr. Eisenberg entered into transactions to purchase movies produced by Paramount Pictures Corp. (Paramount). [3] Some of these transactions were the subject of this Court's opinion in Durkin v. Commissioner, 87 T.C. 1329 (1986), affd. 872 F.2d 1271 (7th Cir. 1989). *415 In these 1978 movie transactions, which were the subject of the litigation in Durkin v. Commissioner, supra (hereafter sometimes referred to as the Durkin case or Durkin), Paramount would sell a movie to Film Writers Co., Inc. (Film Writers), a corporation owned by an individual, John Heyman. Mr. Heyman had developed a close working relationship with Mr. Eisenberg. The sales price of a movie by Paramount to Film Writers was based upon Paramount's cost of producing the movie plus a markup for interest and overhead. A certain portion of the price was paid by Film Writers in cash, short-term recourse promissory notes, a long-term recourse note, and a larger, long-term nonrecourse note. Film Writers, in turn, sold the movies thus acquired from Paramount to investors through partnerships promoted by Mr. Eisenberg. The sales prices to the partnerships included an amount of profit for Film Writers. The terms and conditions of the sale generally tracked the sales by Paramount to Film Writers; however, the long-term indebtedness of the partnerships to Film Writers was a recourse note convertible to nonrecourse upon the happening of an event the Court found in the Durkin *416 case was almost certain to occur at the time the sales contracts were entered into. The Court further found that, as a condition of the sales by Paramount, the eventual purchaser from Film Writers was required to enter into a distribution agreement wherein Paramount would market and exploit the movies. In consideration for the agreement, Paramount received, generally, a distributor's fee of 30 percent of the gross receipts from exhibitors. A portion of the receipts, 1-3/4 percent, was applied toward payment of the notes of the partnerships, plus interest, and specified amounts in excess of the notes. Following that, certain preferred payments to actors and producers who had contracted to receive deferred compensation would be paid, then reimbursements of expenses incurred by Paramount. After all was said and done, the partnerships were entitled to 12.5 percent of net profits and Paramount was entitled to 87.5 percent. This Court held, in the Durkin case, that, contrary to the contentions of the taxpayer-investors, the partnerships had not acquired ownership of the movies but instead acquired a gross receipts and net profits participation interest in the movies. The rights *417 thus acquired entitled the partnerships to amortization deductions as well as investment credit, although not in the magnitude contemplated by the taxpayer-investors. This case involves a similar transaction involving one movie, "North Dallas Forty", and the acquiring partnership, Regina Associates. Since the transaction involving this movie is interrelated with several other movies sold by Paramount to other partnerships at about the same time and also promoted by Mr. Eisenberg, some of the details of the other movies are discussed because of the bearing they have on the "North Dallas Forty" transaction. Petitioners, who were partners in Regina Associates, contend that there are essential differences between the "North Dallas Forty" transaction and the 1978 transactions decided in the Durkin case and that a different result is warranted in this case. Regina Associates was organized as a general partnership in December 1978 for the purpose of investing in one or more movies through Film Writers, along the lines described above. At the time of the partnership's formation, the only two partners were Bernard Filler, another business associate of Mr. Eisenberg, and a corporation, *418 Capital B, Inc. (Capital B). Mr. Filler was president of and a shareholder in Capital B. Mr. Eisenberg contemplated that Regina Associates would subsequently be converted to a limited partnership. Mr. Filler and Capital B would serve as the general partners of the limited partnership. [4]
At the same time, two other partnerships, Century Associates and Pierre Associates, were organized. Mr. Filler and Capital B were also general partners in these two partnerships. Previously, since 1977, Mr. Filler and Capital B had been general partners in various limited partnerships which had purchased 15 movies from Film Writers. Substantially all of these movies originated *419 with Paramount. In late 1978, Mr. Eisenberg and Mr. Heyman, through Film Writers, commenced negotiations to acquire a package of eight movies from Paramount. One of the movies in this package was "North Dallas Forty". In a January 24, 1979, telex to Paramount, Film Writers confirmed the general terms under which the eight movies would be acquired. The telex concluded by stating that all other terms and conditions "shall follow deals concluded between [Film Writers] and Paramount prior to this deal." The eight movies were not yet completed and were in various stages of production. With respect to most of the movies, Paramount had concluded, or was in the process of negotiating, agreements to license the movies for television viewing with American Broadcasting Company, Inc. (ABC), one of the three major television networks. Under the licenses, the movies would be shown on network television following their theatrical exhibition. In a February 1, 1979, telegram, a Paramount attorney advised Mr. Heyman that network television license agreements had been made with respect to five of the eight movies in the package. The telegram further disclosed the amounts for which each of the *420 five movies would be licensed. Subsequently, Paramount decided to eliminate two of the movies from the eight-movie package described in the above January 24, 1979, telex from Film Writers. Another movie, "American Gigolo", was added to the package. "North Dallas Forty" remained in the package. The seven movies now included: "American Gigolo", "Escape From Alcatraz", "North Dallas Forty", "Players", "Prophecy", "Star Trek", and "Starting Over". In a May 1, 1979, telex to Mr. Eisenberg and Mr. Filler, whose corporation, Capital B, was a general partner in the partnerships Century Associates, Pierre Associates, and Regina Associates, Film Writers confirmed the terms under which Film Writers would purchase the seven movies from Paramount. The aggregate price for the seven movies was $ 114,787,400, payable by Film Writers to Paramount as follows: Cash during 1979
$ 6,014,639
By recourse, noninterest-bearing notes,
17,853,485
payable March 15, 1980
Payable by notes due July 15, 1987
90,919,276
Total for 7 movies
$ 114,787,400
The $ 90,919,276 payable on July 15, 1987, was divided into two parts. One portion of the debt, $ 34,436,220 would be evidenced by recourse *421 notes, to be guaranteed by a financial institution acceptable to Paramount. Film Writers, further, was required to make specified interest payments on these notes in 1979, shortly after each movie began theatrical exhibition. The remainder of the $ 90,919,276 aggregate indebtedness, $ 56,483,056, would be evidenced by nonrecourse notes, due July 15, 1987. In addition to payments for the purchase price of the movies, the additional amount of $ 3,080,000 was required to be paid to Paramount during 1979 for advertising costs incurred by Paramount as distributor of the movies. Although the selling prices for the movies are described here in the aggregate, separate sales agreements and separate notes were to be executed between Paramount and Film Writers for each movie. While not stated in the May 1, 1979, telex, it was understood that Paramount would retain 45 percent of the investment credits which could be claimed with respect to the seven movies. The partnership which purchased each movie would thus claim only 55 percent of the total investment credit otherwise allowable on that movie. [5]
*422 In an obvious reference to sales of the movies by Film Writers to investors, the telex provided that "consummation of the transaction specifically requires (A) Paramount's prior review and approval of all offering circulars, prospectuses, and all other documents and Paramount's satisfaction therewith * * *, (B) the delivery to Paramount of an opinion of counsel for FWC [Film Writers] that the offering to the investors in the pictures constitutes a valid private placement under the Federal securities laws and complies with the Illinois Blue Sky Laws, and (C) assurance that all other documents with respect to FWC shall comply with the descriptions thereof as contained in said offering circulars and prospectuses." At this time, Gulf & Western Industries, Inc. (Gulf & Western), Paramount's parent company, was being investigated by the Securities and Exchange Commission. Gulf & Western had retained outside counsel, the New York City law firm of Simpson, Thacher & Bartlett, to represent Paramount in the movie syndications to assure that Gulf & Western and its subsidiaries were in compliance with Federal securities laws. Simpson, Thacher & Bartlett, therefore, were involved in the negotiations *423 on the movie package with Film Writers and the investing partnerships promoted by Mr. Eisenberg. In a May 8, 1979, letter, a Paramount attorney enclosed to an attorney at Simpson, Thacher & Bartlett copies of the network television license agreements with respect to five of the seven movies. The letter concluded that network license agreements had not yet been executed for the movies "Escape From Alcatraz" and "North Dallas Forty" but advised that the Paramount attorney would obtain the "deal points" on these latter two movies from Paramount's west coast office and provide that information to the Simpson, Thacher & Bartlett attorney. The testimony at trial establishes that "deal points" had a literal meaning; i.e., the essential points of a deal or an agreement for a network licensing agreement which had been discussed and perhaps essentially agreed to. As to the seven movies, it was contemplated that Century Associates would acquire, from Film Writers, the movies "Escape From Alcatraz", "Players", "Prophecy", "Star Trek", and "Starting Over"; Pierre Associates would acquire "American Gigolo"; and Regina Associates would acquire "North Dallas Forty". The offering memorandum prepared *424 for investors in Century Associates stated that Century Associates would be converted from a general partnership to a limited partnership upon completion of the offering. The offering memorandum further disclosed that, except for "Escape From Alcatraz", there were network television license agreements for all of the movies Century Associates was to acquire. With regard to the five convertible recourse promissory notes the partnership would give to Film Writers as part of the purchase price for the movies, the offering memorandum stated that, "based on the information available to the general partners, they believe the notes will convert prior to 1987." The network television license fees payable and nontheatrical receipts note conversion amounts for four of Century Associates' movies were as follows: Network
Note Conversion
Movie
License Fee
Amount
Players
$ 7.0 million
$ 7.9 million
Prophecy
8.0 million
9.0 million
Star Trek
9.524 million
11.5 million
Starting Over
7.5 million
9.0 million
The network license agreement for "Escape From Alcatraz" was concluded on August 14, 1979, subsequent to Century Associates' May 26, 1979, purchase of its five movies. *425 "Escape From Alcatraz" was licensed to ABC for $ 12.75 million. The nontheatrical note conversion amount for the movie was $ 9.5 million. An agreement to license "American Gigolo" to ABC for $ 6 million had been entered into on October 1, 1978. While Pierre Associates entered into a May 26, 1979, agreement to purchase "American Gigolo", this transaction was ultimately rescinded in 1980. Paramount was unable to deliver the movie by the agreed date because of production delays. Negotiations with National Broadcasting Co., Inc. (NBC), another major television network, to which "North Dallas Forty" was eventually licensed, did not commence until after May 26, 1979, the date Regina Associates entered into its purchase agreement for the movie. The nontheatrical note conversion amount on the partnership's purchase note is discussed infra. The above note conversion amounts for each of the seven movies was set by Mr. Eisenberg and Mr. Heyman. Paramount was not involved in this determination. No offering memorandum was prepared for the investors in Regina Associates. Mr. Eisenberg decided to have himself and members of his law firm become partners in Regina Associates. Previously, *426 Mr. Eisenberg and certain members of his firm had invested in a partnership which purchased the movie "One Flew Over The Cuckoo's Nest" from Paramount. They made over a million dollars on their investment in that partnership. At the outset of their negotiations, Paramount furnished Mr. Eisenberg and Mr. Heyman information on its estimated budget for producing each of the movies the three partnerships (Century Associates, Pierre Associates, and Regina Associates) were to acquire. They were also advised of the elements of each movie, its story line, director, actors, etc. Mr. Eisenberg had read the novel upon which the movie "North Dallas Forty" was based. He further had Mr. Heyman interview Frank Yablans, the individual who was producing the movie for Paramount. Mr. Yablans had formerly headed Paramount and was an acquaintance of Mr. Heyman. Mr. Yablans was very enthusiastic about the movie's prospects and believed that it could "really be a big hit"; i.e., earn $ 40 million or more in gross receipts. On May 26, 1979, Film Writers and Paramount entered into separate sale/purchase agreements for the seven movies, "American Gigolo", "Escape From Alcatraz", "North Dallas Forty", *427 "Players", "Prophecy", "Star Trek", and "Starting Over". With regard to "North Dallas Forty", Film Writers acquired no sequel rights to the movie. The aggregate purchase price for the seven movies was $ 114,787,400. Paramount retained a security interest in each movie to secure the unpaid portions of the purchase price. The seven recourse promissory notes executed by Film Writers to Paramount, which totaled $ 34,436,220, were guaranteed by an unrelated New York City investment company. This guarantee was required by Paramount. As noted and discussed later, there was no similar guarantee required of Film Writers in the Durkin case. Among other things, the amount guaranteed would generally be reduced dollar for dollar by the total television revenues (network, cable, syndicated, etc.) received or payable resulting from the exploitation of the seven movies during the period from May 26, 1979, through July 15, 1987. Other reductions in the amount guaranteed were to be made based on the total nontelevision revenues earned by the seven movies. Film Writers paid the New York investment company a $ 350,000 fee for its guarantee. Mr. Heyman testified that Paramount required the *428 $ 34,436,220 guarantee because Paramount did not want to rely solely on having to collect the note from "[his] flaky little Chicago or New York corporation, with a net asset value of el zilcho." At the time the guarantee was provided, network television licenses with ABC for five of the movies were already in place for amounts totaling in excess of $ 38 million. In the sale/purchase agreements with Film Writers, Paramount warranted that each movie would qualify for a no more restrictive rating than "R" by the rating administration of the Motion Picture Association of America, and that Paramount would deliver appropriate "cover" so that the movie could be broadcast by television in conformity with standards of the National Association of Broadcasters. The same warranty was provided in the sale/purchase agreements between Film Writers and the partnerships, including Regina Associates. At trial, the word "cover" was described as the production of alternate scenes of a movie to substitute for scenes which do not meet national broadcast standards. Further, in the New York investment company's guarantee agreement, it was provided that the obligations of the guarantor would terminate *429 if Paramount failed to perform any obligation on its part to be performed or otherwise breached or defaulted any provision of any television licensing agreement. The testimony at trial indicated that the failure of a distributor to either provide cover or the failure to successfully edit a picture to conform the picture to national broadcast standards constituted a breach of warranty or a default if such an obligation existed in a television licensing agreement. In the case of "North Dallas Forty", no cover was produced because so much of the movie required alternative shots that the director complained that it would have virtually required production of a new movie. In spite of the fact that no cover existed, none of the parties in the "North Dallas Forty" transaction ever attempted to rescind any of the agreements regarding the movie. Film Writers, contemporaneously, entered into various agreements to sell the seven movies to Century Associates, Pierre Associates, and Regina Associates. Film Writers sold each movie for a stated purchase price ranging from $ 150,000 to $ 750,000 above the price for which it had purchased the movie from Paramount. The stated purchase prices *430 for which Film Writers acquired the movies from Paramount and the selling prices for which the movies were resold to the partnerships are as follows: Purchase Price
Selling Price
Movie
to Film Writers
to Partnership
American Gigolo
$ 7,312,500
$ 7,462,500
Escape From Alcatraz
14,372,800
14,622,800
North Dallas Forty
[1] 11,570,000
11,770,000
Players
7,823,400
7,973,400
Prophecy
9,730,500
9,880,500
Star Trek
50,830,000
51,580,000
Starting Over
13,148,200
13,348,000
Based on the selling prices to the partnerships, Film Writers realized an overall gross profit of $ 1,849,800. The sales agreement between Film Writers and Regina Associates for "North Dallas Forty" was dated May 26, 1979. The selling price was $ 11,770,000, payable as follows: On May 26, 1979
$ 25,000
Payable Aug. 15, 1979, or the date of the movie's
743,183
first public exhibition, whichever was later
Payable March 15, 1980
1,802,000
By note, bearing 8% interest, due July 15, 1987
9,199,817
Total
$ 11,770,000
*431 Additionally, Regina Associates was required to pay interest of $ 122,317 on the $ 9,199,817 note on August 15, 1979, or the date of the movie's first public exhibition, whichever was later. The $ 9,199,817 note was a recourse note which would convert to nonrecourse status on either of the following events: (1) The distributor's gross receipts on the movie reaching $ 20 million, a minimum of $ 10 million of such receipts being from foreign sources; or (2) the distributor's gross receipts on the movie from nontheatrical sources reaching $ 7 million. In the agreement for purchase of the movie, Regina Associates recited that it was "a limited partnership organized under the laws of the state of Illinois." Under the agreement, Regina Associates was required to furnish guarantees from its limited partners for 97 percent of the $ 9,199,817 recourse note. These guarantees would terminate upon the note's becoming nonrecourse. Mr. Filler, as general partner of Regina Associates, signed the agreement on behalf of the partnership. The $ 9,199,187 note Mr. Filler executed on behalf of the partnership also described Regina Associates as an Illinois limited partnership. Regina Associates *432 entered into a distribution agreement with Paramount on May 26, 1979. In this agreement, Paramount was granted worldwide rights to the distribution, exhibition, exploitation, and marketing of "North Dallas Forty". Paramount would not have initially sold the movie to Film Writers unless the ultimate distribution rights to the movie returned to Paramount. The distribution fees payable to Paramount under the agreement were percentages of the gross receipts received from exhibition of the movie, as follows: (1) From theatrical and pay television: 30% United States and Canada 35% United Kingdom
40% Rest of world 10% Territorial grants (2) From free television: 25% United States network television 35% United States and Canadian syndication 40% Rest of world The term of the agreement was 28 years, which Paramount could extend for two additional terms of 28 years each and, thereafter, in perpetuity. For the first extension, Paramount was required to pay, subject to an exception not pertinent for our purposes here, $ 25,000, which constituted an advance on future amounts owing to Regina Associates under the distribution agreement. No payments were required for *433 subsequent extensions of the agreement. The gross receipts received by Paramount were to be apportioned as follows: (1) Regina would receive 1-3/4 percent of gross receipts until such time as the partnership had been paid $ 11,570,000 plus interest at 8 percent per annum, after which Regina would receive an additional 1-3/4 percent of gross receipts up to $ 578,500; (2) Paramount would retain its percentage distribution fees shown above; (3) Paramount would receive reimbursements for all distribution advances paid or incurred in connection with exploitation of the movie; (4) payments to specified persons or entities who were entitled to deferred compensation or gross participation interests by reason of contractual commitments in the production of the movie; (5) to the extent Regina had not been paid the amounts specified in paragraph (1), 100 percent of gross receipts up to the sum of $ 12,166,933.71 plus 8 percent interest; and (6) all remaining gross receipts apportioned 12.5 percent to Regina Associates and 87.5 percent to Paramount. A substantial portion of the gross receipts payable to Regina Associates was to be withheld by Paramount until January 30, 1984. Film Writers and *434 Regina Associates, respectively, executed documents dated May 26, 1979, entitled "Notice of Irrevocable Authority" in favor of Paramount. These documents allowed Paramount to retain funds due it pursuant to the sale of "North Dallas Forty" to Film Writers. This avoided a circular flow of money from Paramount to Regina Associates under the distribution agreement, then from Regina Associates to Film Writers, and, finally, from Film Writers to Paramount. It was felt that this agreement would protect Paramount from the claims of creditors of Film Writers and Regina Associates to the distribution proceeds of "North Dallas Forty" payable to those two entities. Guarantees totaling $ 9,107,817 were executed by the limited partners of Regina Associates with respect to the $ 9,199,817 note executed by Regina Associates to Film Writers. The amount of each guarantee generally corresponded to that partner's interest in the partnership. [6]
*435 An amended written partnership agreement of Regina Associates, dated August 1, 1979, recited that the partnership's original general partners (Mr. Filler and Capital B) were joined by other partners on February 1, 1979, and that Capital B withdrew from the partnership on June 1, 1979, and was replaced by an individual named Lester Bernstein. Mr. Bernstein had previously been a salesman and was a high school friend of Mr. Eisenberg. On August 3, 1979, "North Dallas Forty" was first publicly shown in movie theaters. The movie received favorable reviews from critics and generally was well received by the general public. The movie was based on a novel by Peter Gent. It starred Nick Nolte and Mac Davis. The movie portrayed the seamier side of professional football. It centered on the growing disillusionment and alienation of a veteran player (played by Nolte) as he discovered that professional football was not a sport or game but only a business to the team owners and coaches. In the movie, there was a considerable amount of sex, nudity, and profanity. The movie had an "R" rating. On or about August 23, 1979, Frank Yablans advised Mr. Eisenberg that Paramount was negotiating *436 a network television license of between $ 7 million to $ 8 million for the movie. On or about October 25, 1979, Mr. Eisenberg, upon inquiry to the individual in charge of movie distribution for Paramount, was told by this individual that he estimated "North Dallas Forty" would earn domestic gross receipts, excluding television, of $ 20 million. In a November 2, 1979, memorandum to Regina Associates' partners, Mr. Eisenberg advised them that the latest projection was that the movie would earn gross theatrical receipts of between $ 20 million and $ 22 million, which he considered was conservative. He further advised that, while a network television license agreement had not yet been concluded, he expected that a "minimum" network television license of the movie would be $ 5 million. He added that, based on these revenue figures, they would about break even. [7]
*437 On November 7, 1979, Paramount entered into an agreement with Home Box Office, Inc. (HBO), for the movie to be shown on cable television. HBO agreed to pay a license fee of $ 2.18 million. The $ 743,183 payment which was due by Regina Associates on August 15, 1979, was, by agreement of the parties, paid in two installments in the latter part of 1979. On or about March 15, 1980, Regina Associates paid the $ 1,802,000 due by the partnership under the May 26, 1979, movie purchase agreement. A substantial portion of this obligation was discharged through amounts due the partnership under its distribution agreement with Paramount. Interim financing was obtained from a Chicago bank for that portion of the payment made by the partnership. The Eisenberg law firm partnership borrowed monies pursuant to an $ 840,000 line of credit granted to the law firm by a Chicago bank. Mr. Eisenberg and 11 of his law partners personally guaranteed repayment of the Chicago bank's loans. In a May 2, 1980, letter, Paramount advised Film Writers that the New York investment company's liability had expired under the $ 34,436,220 guarantee which the investment company had issued to Paramount. Under *438 the terms of the guarantee, the letter stated, the New York investment company had no further obligation based on the theatrical revenues received on the movies and the network television and cable television license fees which were payable. On June 18, 1980, Paramount and NBC entered into a network television license agreement on "North Dallas Forty" for $ 7 million. The agreement required Paramount to edit or revise a considerable portion of the movie in order that the movie would satisfy NBC's broadcast standards. At the time the licensing agreement was entered into, the revisions had not yet been made, and there was attached to the licensing agreement a three-page list of specific language which had to be deleted from the movie. Even with these deletions, the agreement allowed NBC to require further editing to comply with NBC's broadcast standards and provided: "If the picture is unacceptable under such policies [NBC broadcast standards], NBC shall have no obligation under this agreement * * * and shall be entitled to a refund of any monies paid. NBC's decision as regards the policies of NBC's Department of Broadcast Standards shall be final." The movie was subsequently shown *439 on network television by NBC after extensive editing to delete offensive language and nudity such that the movie would pass broadcast standards. Regina Associates' $ 9,199,817 recourse note converted to nonrecourse status as a result of the $ 7 million network television agreement with NBC. The note, however, was never paid in its entirety. On April 3, 1989, Paramount, Regina Associates, and Film Writers entered into an agreement wherein the parties completely released each other from any and all obligations relating to "North Dallas Forty". Title to the movie was conveyed to Paramount in consideration for which Paramount paid $ 113,000 to Regina Associates, thus closing the book on "North Dallas Forty" and concluding all interests of Regina Associates in the movie. Over the period from May 26, 1979, through June 27, 1987, "North Dallas Forty" earned gross receipts in excess of $ 29.5 million. Of the $ 29.5 million in gross receipts, approximately $ 27.6 million had been earned as of September 24, 1983, approximately $ 28.2 million had been earned as of September 22, 1984, and approximately $ 28.6 million had been earned as of September 28, 1985. [8]
*440 Regina Associates utilized the cash method of accounting. The partnership reported substantial net losses in each of the years 1979 through 1982. For 1983 and 1984, the partnership reported net profits. A substantial portion of the reported losses came from depreciation of the movie, using the straight-line method and a 3-year useful life. For investment credit purposes, the movie's useful life was based on 5 to 7 years. Petitioners stipulated that $ 400,000 advertising expenses claimed by Regina Associates for 1979 should have been capitalized as part of the partnership's cost or basis in the movie. Respondent conceded that $ 122,317 interest expense claimed by the partnership for 1979 was paid but asserted the amount paid should be capitalized as part of the partnership's cost or basis since there was no valid underlying indebtedness upon which interest could be paid. Respondent also conceded that the partnership paid $ 88 office and administrative expenses for 1979, $ 1.60 taxes for 1980, and $ 4,750 professional fees for 1982. However, respondent asserted in amended answers that these deductions are not allowable on the ground that the partnership was not engaged in an *441 activity for profit. OPINION Ownership Interest Versus Gross Receipts and Net Profits Participation Interest
For tax purposes, the sale of a movie occurs when there is a transfer of all substantial rights of value in the movie copyright. Durkin v. Commissioner, 87 T.C. 1329, 1369 (1986), affd. 872 F.2d 1271 (7th Cir. 1989); Tolwinsky v. Commissioner, 86 T.C. 1009, 1042-1043 (1986). The transaction in this case parallels the various movie transactions involving Paramount, Film Writers, and partnerships organized by Mr. Eisenberg which were considered by this Court in Durkin v. Commissioner, supra. In the Durkin case, this Court concluded that Paramount had not divested itself of, and the partnerships had not acquired ownership of, the movies involved in that case. Durkin v. Commissioner, supra at 1369-1370. The Court of Appeals for the Seventh Circuit, in affirming, summarized this Court's conclusions on this issue as follows: The Tax Court concluded that the rights in the six movies acquired by Balmoral and Shelburne were too insubstantial to qualify as ownership interests for *442 purposes of depreciation deductions. This conclusion was amply supported by the record. Except for the partnerships' bare title to the copyrights, Paramount retained the rights to produce copies, prepare derivative works, distribute copies to the public, exhibit the movies to the public, and display still photographs taken therefrom. Paramount even retained the remake sequel rights and vital financial interests in the motion pictures and their proceeds. A Paramount official testified that it would not have sold the films without receiving back the rights to exploit them. Under the agreements in question, as accurately described by the Tax Court, Balmoral and Shelburne retained only the right to inspect the negatives, and that right was never exercised. At the time of the "sale," whatever rights the partnerships acquired were immediately transferred back to Paramount except for bare title. Paramount rather than the partnerships was the true owner of the films because of its financial interest and control over their commercial exploitation. Durkin v. Commissioner, 872 F.2d at 1275.
In the Durkin case, this Court and the Seventh Circuit concluded that *443 the partnerships nevertheless acquired or retained a gross receipts and net profits participation interest in the distribution revenues from the movies. This net profits participation interest entitled the partnerships to deductions for depreciation or amortization of an intangible asset and further entitled the partnerships to investment credit under section 48. Durkin v. Commissioner, 87 T.C. at 1372-1373, 1383. However, for purposes of depreciation and investment credit, this Court reduced substantially the basis or cost of the intangible assets by disregarding or removing from basis the long-term nonrecourse notes executed by the partnerships as part of the purchase price of the movies. With respect to this determination, this Court stated: When a transaction is structured in such a manner, that payment by the taxpayer is not probable, either because of the length or the terms of the debt, the source of the payments, or any other arrangement which does not provide an economic incentive for the taxpayer to pay the debt, then such debt is not genuine indebtedness to be taken into account for purposes of determining a taxpayer's investment in property. *444 Such a debt does not reflect an actual investment in property and cannot be included in the taxpayer's depreciable basis. [Citations omitted.] Durkin v. Commissioner, 87 T.C. at 1376-1377. The Seventh Circuit affirmed this Court on this conclusion, adding: As the Tax Court found, the principal difference between the purchase and sale of the movies by FWC and the partnerships is that the partnerships financed the purchase with recourse debt subject to conversion while FWC used mostly nonrecourse debt. The transaction was structured in this manner to lend the debt the appearance of being at risk within the meaning of Section 465 of the Internal Revenue Code. The Tax Court found that this increase in purportedly recourse debt exceeded the fair market value of the insignificant ownership rights in the films retained by the partnerships, thus indicative of the parties' expectations that the recourse debt would not be collected from the individual partners if the partnerships failed to make payment. To this extent, these partnerships were classic tax shelters, for the aggregate purchase price unreasonably exceeded the value of the property. Therefore the *445 notes did not constitute genuine indebtedness and could not be included in the purchasers' bases in the property. The Tax Court was correct in excluding the long-term notes from the partnerships' bases, leaving the sum of the cash and short-term notes as the depreciable basis. [Emphasis added; citations and fn. refs. omitted.] Durkin v. Commissioner, 872 F.2d at 1277-1278. In this case, respondent contends that petitioners, through their partnership Regina Associates, held a contractual right to proceeds from the movie "North Dallas Forty", as in the Durkin case, and that the amortizable basis for such rights was limited to the amount of cash payments made by the partnership totaling $ 2,374,874 rather than the $ 11,770,000 claimed by petitioners. Petitioners, on the other hand, do not dispute the results or the conclusions of Durkin v. Commissioner, supra. Petitioners contend there are significant factual differences between this case and the Durkin case and that, because of these differences, petitioners' partnership acquired ownership of the movie rather than a contractual or profit-sharing interest. Petitioners further contend that *446 the entire amount contracted for the movie, consisting of indebtedness and cash totaling $ 11,770,000, constitutes their basis for purposes of depreciation and the investment credit. Respondent also contends that Regina Associates was not engaged in an activity for profit under section 183, a contention which was not advanced in the Durkin case. Petitioners first assert that, unlike the partnerships in the Durkin case, Regina Associates was a general partnership and, as such, the general partners were personally liable for all of the partnership's liabilities. This difference is not of any significance. The conclusion in the Durkin case was not based upon whether the partnerships were general or limited partnerships. It is evident that the conclusions reached in the Durkin case were based upon the substance of the agreements between the parties and, in particular, whether the benefits and burdens of ownership of the movies transferred. The character of the entities involved in the transactions had little, if any, bearing on the Court's conclusion. Therefore, whether Regina Associates was a general or limited partnership is of no consequence in this case. The *447 Court notes that, although petitioners contend that Regina Associates was a general partnership, there is some question whether such was the case. In the purchase agreement with Film Writers and in the distribution agreement with Paramount, Regina Associates represented itself to be a limited partnership. Moreover, Regina Associates thereafter corresponded with these parties on letterhead stationery which identified it as a limited partnership. The Court finds it unnecessary at this juncture to determine whether Regina Associates was a general or limited partnership; however, that question becomes material in another context discussed later in this opinion. In the purchase agreement with Film Writers, the long-term recourse note of $ 9,199,817 executed by Regina Associates would convert to nonrecourse if either gross receipts of the movie reached $ 20 million ($ 10 million of which was required to be from foreign sources), or $ 7 million was received from nontheatrical sources. The parties are in agreement that the $ 20 million threshold was not likely to ever be reached primarily because "North Dallas Forty" was about professional football, and no one anticipated the movie would *448 have any foreign appeal. The movie, in fact, had little foreign appeal. However, the $ 7 million threshold from nontheatrical sources, primarily free television, and cable and syndicated television presents the central question in this case. In the Durkin case, at the time the contracts were entered into with the partnerships, television licensing agreements for exhibition of the movies on free television were almost in place, and there was a virtual certainty that sufficient nontheatrical proceeds would be received to convert the long-term recourse notes to nonrecourse status. Petitioners here argue strenuously that, at the time Regina Associates purchased "North Dallas Forty" on May 26, 1979, there was no television licensing agreement in place nor was such an agreement entered into until June 18, 1980. The contract was entered into with NBC on that date for $ 7 million. Petitioners argue that there was a strong possibility the movie would never be shown on free television because the movie was much longer than normal for television viewing, which meant that certain portions of the movie would have to be cut. Additionally, the movie was fraught with vulgarity, nudity, *449 and profanity, all of which were required to be excised as a condition by all of the networks in free television in order to conform the movie to national broadcast standards. As in most movies, during production, alternative scenes are produced (referred to as "cover") as a substitute for objectionable scenes so that the movie meets acceptable television broadcast standards. In the case of "North Dallas Forty", no cover was ever produced because there were so many objectional scenes that the director complained that producing cover would have virtually meant producing another movie. The movie also depicted the seamier side of professional football, and petitioners' expert testified that the television networks might not be interested in "North Dallas Forty" to avoid offending the National Football League, which might jeopardize the networks' chances in obtaining television contracts with the National Football League for professional football games. Respondent's expert, however, disputed petitioners' expert on this latter point. At the time the seven movies were sold by Paramount to Film Writers, network television licensing agreements were either in place or substantially agreed *450 to with respect to five of the movies. "North Dallas Forty" was not included in this group. The Court is satisfied from the evidence that Paramount, having worked out television licensing agreements for five movies, was also working on a licensing agreement for "North Dallas Forty" during 1979 at the time the transactions took place with Film Writers and Regina Associates. It is evident from the record that Mr. Eisenberg and Mr. Heyman were kept fully informed of the progress of the negotiations during 1979. Mr. Eisenberg, throughout 1979, gave optimistic reports to the partners of Regina Associates not only as to the theatrical progress of the movie but the prospects for television licensing of the movie. A licensing agreement was entered into with HBO on November 7, 1979, for showing the movie on cable television for $ 2.18 million. Prior to that date, the producer of the movie, Mr. Yablans, advised Mr. Eisenberg in August 1979 that Paramount was negotiating for a network television license of between $ 7 and $ 8 million for "North Dallas Forty". The Court recognizes that there were genuine concerns as to whether "North Dallas Forty" could be made adaptable to satisfy national *451 television broadcast standards. However, in spite of these doubts, no evidence was introduced to show that these concerns had any adverse effect on the amount which would be realized from network television. All of the evidence indicates that the amounts expected from network television for "North Dallas Forty" were commensurate with the amounts received for the other movies. Moreover, the claimed problems or concerns about "North Dallas Forty" had no effect in determining the selling price by Paramount to Film Writers and by Film Writers to Regina Associates. Damaged or flawed merchandise generally results in a lower selling price. That was not the case here. The conversion amount of $ 7 million was determined by Mr. Eisenberg ostensibly in negotiation with Mr. Heyman. Paramount, however, was not involved in that determination. The Court is satisfied that, at the time the agreements involving "North Dallas Forty" were executed between Paramount, Film Writers, and Regina Associates in 1979, there was reasonable certainty, if not on May 26, 1979, certainly by December 31, 1979, that a television licensing agreement or agreements would be entered into for the movie, and that *452 the proceeds therefrom, along with the $ 2.18 million already in place from HBO, would exceed $ 7 million. To be sure, as noted, there were valid concerns as to whether the movie could be edited to satisfy national broadcast standards and, at the same time, not destroy the central theme and quality of the movie. The Court views that uncertainty not as an event which would lend credence to the conversion event of the note for tax purposes but rather a contingency which afforded Regina Associates a convenient way out of the entire transaction if the movie floundered. Paramount and Film Writers warranted that the movie was adaptable for television and warranted that cover would be produced which would make the movie adaptable for television. Paramount never produced cover. The testimony at trial was that the failure or inability to adapt the movie to satisfy national broadcast standards, and the failure to produce cover, constituted material breaches of warranty by Paramount. Regina Associates and Film Writers could have caused a rescission or cancellation of the agreements. Although this right was never asserted, it allowed Regina Associates the opportunity to enjoy the best *453 of both worlds: Regina Associates could purchase the movie with the reasonable certainty that its long-term recourse note of $ 9,199,817 would convert to nonrecourse and, thus, the partners would be free of personal liability on the note. On the other hand, if the note failed to convert because the movie could not be adapted for free television viewing, the failure of the note to convert would obviously be attributable to a material breach of warranty by Paramount, which would allow the partners to rescind the entire agreement and be relieved of liability on the $ 9,199,817 note. Regina Associates, therefore, and its partners, were free of risk either way the situation developed. The Court is satisfied from the record that the partners in Regina Associates would not have allowed themselves to be strung out with personal liability on a note in excess of $ 9 million without some certainty that their personal liability would terminate within some reasonable period of short duration. The difference in the facts, therefore, between this case and the Durkin case, on this point, is not material. Another difference between this case and the Durkin case, urged by petitioners, is *454 that, in this case, a substantial portion of the long-term recourse indebtedness owing by Film Writers to Paramount was guaranteed by an unrelated independent investment company. In the Durkin case, the corresponding portion of such indebtedness owed by Film Writers was neither recourse nor guaranteed. As a result, in the Durkin case, the long-term indebtedness owing by the partnerships to Film Writers was held to be illusory because it was unlikely that Film Writers would pursue collection against the partnerships if Paramount had no recourse against Film Writers. The point made by petitioners here is best illustrated by the following tables showing the terms of the two sales agreements involving "North Dallas Forty": Sale: Paramount To Film Writers
Cash Payments:
Totals
5/26/79
$  25,000
8/15/79
609,683
$    634,683
Notes:
3/15/80 [1]
$ 1,735,000
$ 1,735,000
7/15/87 [2]
3,471,000
7/15/87 [3]
5,728,817
$ 9,199,817
Total selling price
$ 11,569,500
*455 Sale: Film Writers To Regina Associates
Cash Payments:
Totals
5/26/79
$    25,000
12/3/79
743,183
3/15/80
1,802,000
$  2,570,183
Notes:
7/15/87 [1]
$ 9,199,817
$  9,199,817
Total selling price
$ 11,770,000
In the above tables, in the sale from Paramount to Film Writers, petitioners refer to the $ 3,471,000 long-term recourse note which was part of the omnibus guarantee of $ 34,436,220 by the New York investment company for the seven movies sold to Film Writers. Petitioners contend that, because this note was a recourse obligation and was independently guaranteed, unlike the situation in the Durkin case, the stigma of "illusion" found in the Durkin case did not exist here because, if Film Writers or the guarantor was made to pay this obligation, Film Writers or the guarantor would certainly have enforced collection against Regina Associates on the corresponding larger long-term obligation of $ 9,199,817. *456 Petitioners overlook the fact that the $ 9,199,817 note owing by Regina Associates was reasonably certain to convert to nonrecourse, in which event, Film Writers or the guarantor could not have enforced collection against Regina Associates. If the note did not convert as expected, and Regina Associates and its partners became uneasy about their personal liability on the note, the partnership (and Film Writers, in turn) held a trump card by which the transaction could be rescinded for breach of warranty. Moreover, it is very unlikely that Paramount could ever have collected anything against Film Writers because Mr. Heyman, president of Film Writers, testified that the net worth of Film Writers was "el zilcho". The independent guarantee of the New York investment company terminated very shortly after it was executed because of the $ 38 million television licensing contracts on the five movies. The guarantee was reduced dollar for dollar on receipts from these contracts. Additionally, the guarantee terminated if Paramount breached the contract with the television networks in failing to provide a movie that would pass acceptable broadcast standards. For all practical purposes, *457 therefore, Film Writers had no liability on the purported long-term recourse note it owed to Paramount, and the purported independent guarantee was short lived and had little significance on the notes it purportedly guaranteed. Therefore, the "illusion" found by this Court in the Durkin case is equally applicable here to the nonrecourse $ 9,199,817 long-term note of Regina Associates. Finally, petitioners point out that the partners of Regina Associates were required to personally guarantee 97 percent of the $ 9,199,817 long-term note executed by Regina Associates to Film Writers. Such a guarantee was also required of the limited partners in the Durkin case. The guarantees here, as in the Durkin case, terminated once the note converted to nonrecourse. The Court attributes no significance to these guarantees and, moreover, questions why the guarantees were even necessary. If Regina Associates was a general partnership, as petitioners contend, the partners were personally liable for all liabilities of the partnership and their liability would have extended to 100 percent of partnership debts rather than 97 percent. The personal guarantees served no purpose. On the *458 other hand, if Regina Associates was a limited partnership (as it represented itself to be in the agreements with Film Writers and Paramount), it is conceivable that the purpose of the personal guarantees would have been to place the partners at risk to satisfy the requirements of section 465. However, the guarantees would not have accomplished this purpose because Regina Associates, the partnership, was the primary obligor on the $ 9,199,817 note and, where a taxpayer's debt obligation, such as a guarantee, constitutes only a secondary liability under which the taxpayer has a right of reimbursement against the primary obligor, the taxpayer is not at risk because the right of reimbursement to the taxpayer from the primary obligor is considered a protection against loss within the meaning of section 465(b)(4). See Larsen v. Commissioner, 89 T.C. 1229, 1273 (1987). Petitioners here were secondary obligors under their personal guarantees and, therefore, were not at risk under section 465 because of these guarantees. Therefore, the personal guarantees had no significance even if Regina Associates was a limited partnership. All of the other arguments raised by *459 petitioners involve identical facts which existed in the Durkin case and, therefore, are of no benefit to petitioners here. In conclusion, the facts surrounding Regina Associates' transaction are not meaningfully distinguishable from the partnership transactions in Durkin v. Commissioner, supra. Paramount retained virtually all substantial ownership rights in the movie "North Dallas Forty". Under the distribution agreement, Paramount was granted all advertising, exhibition, and exploitation rights to the movie in perpetuity, if it desired. There was no limit placed on the profit which Paramount could derive from its distribution efforts. In contrast, after Regina Associates had received an amount of gross receipts which was $ 578,000 above its break-even point on the movie, Regina Associates would have only a 12.5 percent interest in the movie's net profits. The Court holds that Regina Associates did not have an ownership interest in the movie "North Dallas Forty". The partnership acquired only a gross receipts and net profits participation interest in the movie. Therefore, respondent's position on this issue is sustained. Whether the Partnership's $ 9.199 *460 Million Note Was a Bona Fide Indebtedness
In Durkin v. Commissioner, 87 T.C. at 1379-1382, the Court concluded that the long-term notes executed by the partnerships were not bona fide debts: Our conclusion concerning the long-term notes is based in part upon the expectation of the law firm and the petitioners, at the time the parties executed the relevant agreements, that such notes would convert regardless of the success of the motion pictures. * * * Clearly, the occurrence of the conversion events was, while not certain, very likely. The conversion events bore little relationship to the ability of the motion pictures to generate sufficient funds to pay off the converted notes. * * * There is no objective evidence in the record that supports the petitioners' contention that the conversion events were bona fide. The structure of the transactions was designed to produce the appearance of "risk" within the meaning of section 465. The members of the law firm, including Mr. Eisenberg, were experts in tax law and the aspects of the entertainment law relevant to this case. They must have recognized that the partnerships were receiving bare legal title to the *461 motion pictures. Despite this, they structured a series of transactions wherein the partnerships purportedly were at risk to * * * [Film Writers] for $ 41,232,400 when they knew * * * [Film Writers] was only at risk for $ 8,514,050. The larger amount clearly exceeded the fair market value of the rights the partnerships received. This tremendous increase in recourse debt was not the result of arm's-length negotiation; it resulted from the knowledge of Mr. Heyman and the law firm that the limited partners had to be personally liable on the debt in order to reap maximum tax benefits from the transaction. Given the long history of deals between Mr. Heyman and the law firm and the dominant position Mr. Eisenberg held in these transactions, we can only conclude that the transactions were structured with the expectation that the increased purportedly recourse debt of $ 32,718,350 would not be collected if the motion pictures were not successful. * * * In summary, we believe the "true" cost of the movies to the partnerships was * * * equal to the cash and short-term notes * * *. The amount represented by the long-term recourse notes * * * was designed merely to provide a flow of funds *462 to the owner of the motion pictures, Paramount, while providing the appearance of ownership by the partnerships. * * * As in the Durkin case, the $ 9.199 million note in this case was not part of Regina Associates' true cost for its gross receipts and net profits participation interest in "North Dallas Forty". This purported convertible recourse debt exceeded the fair market value of the rights the partnership acquired in the movie. Only the cash and other short term obligations of the partnership were intended to be paid. Paramount expected payment on these other obligations, and payment in fact was made. The personal guarantees issued by the partners in Regina Associates provided some measure of security that the amount of the cash and short-term obligations owing would be paid. The Court concludes that the $ 9.199 million note was not a bona fide indebtedness and is not includable in the partnership's basis for its interest in the movie. The Court accordingly does not find it necessary to consider the question whether the parties were at risk under section 465. Profit Objective
In amended answers, respondent asserted that Regina Associates was not engaged in *463 an activity for profit under section 183. The burden of proof on this issue is on respondent. Rule 142(a). For petitioners to be entitled to the deductions and credits claimed with respect to their investments in Regina Associates, the partnership, among other things, must have undertaken its activity with an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the expectation of profit need not have been reasonable, the activity must have been entered into, or continued, with the bona fide objective of making a profit. Taube v. Commissioner, 88 T.C. 464, 478-479 (1987). Profit in this context means economic profit, independent of tax savings. Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986). The determination is to be made at the partnership level. Brannen v. Commissioner, 722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Taube v. Commissioner, supra at 478. Profit objective is a question of fact and is to be determined *464 from all the facts and circumstances. Dreicer v. Commissioner, supra at 645. The regulations under section 183 list nine factors that should be taken into account in determining whether an activity is engaged in for profit. Sec. 1.183-2(b), Income Tax Regs. No one factor is determinative, and the regulations recognize that the nine factors listed are not the only factors which may be taken into account. As indicated above, the Court has determined that Regina Associates had a gross receipts and net profits participation interest in the movie "North Dallas Forty" and not an ownership interest. The Court has further determined that the $ 9.199 million convertible recourse note was not a bona fide indebtedness. Nevertheless, respondent has failed to establish that the partnership lacked the requisite profit objective. Mr. Eisenberg had significant expertise with respect to investments in motion pictures. Previously, he and other members of his law firm had made over $ 1 million on their investment in another movie partnership. They had invested in other movies as well. All of the expert witnesses agreed that "North Dallas Forty" was a quality movie *465 that would command public appeal. Mr. Eisenberg testified that he originally estimated that, for the partnership to break even, the movie would have to earn gross receipts of between $ 33 million and $ 36 million, roughly three times the $ 11.77 million stated purchase price. One of respondent's experts confirmed that this was a reasonable rule of thumb to employ during 1979. As of June 1987, the distributor's gross receipts were in excess of $ 29.5 million. The movie industry is highly speculative. As of the May 26, 1979, date Regina Associates entered into its transaction, the Court holds that there were some prospects that "North Dallas Forty" could "really be a big hit" and produce a profit for the partnership. Respondent has not met the burden of proof on this issue. Rule 142(a). Useful Life of Partnership's Interest in Movie
A contractual right to participate in a motion picture's gross receipts or net profits is an intangible asset. Section 167 allows the use of the straight-line method for such property. Durkin v. Commissioner, 87 T.C. at 1373; Law v. Commissioner, 86 T.C. 1065, 1100, 1103-1104 (1986); Tolwinsky v. Commissioner, 86 T.C. 1009, 1052-1054 (1986). *466 As in Durkin v. Commissioner, supra at 1376, there was expert testimony in this case that television syndication of a movie would begin approximately 5-1/2 to 6 years after its initial theatrical release. Moreover, petitioners, on their individual returns, claimed that "North Dallas Forty", for investment credit purposes, had a useful life of between 5 and 7 years. See sec. 46(c)(2). Based on the record as a whole, the Court finds that 6 years was the useful life of Regina Associates' interest in the movie. Investment Credit
A taxpayer is entitled to an investment credit under section 48 with respect to a movie only if the movie is "new section 38 property" which is a "qualified film" and only to the extent the taxpayer has an "ownership interest" in such movie. Sec. 48(k)(1)(A). Respondent does not dispute that "North Dallas Forty" was a qualified film. A taxpayer may have an ownership interest in a movie for purposes of the investment credit even if the taxpayer has neither legal title to the movie nor a depreciable interest in the movie. Section 48(k)(1)(C) provides that a taxpayer's ownership interest in a qualified film "shall be determined *467 on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." The existence and extent of an ownership interest is determined at the time the movie is placed in service. Sec. 1.48-8(a)(4)(ii), Income Tax Regs. Under section 1.48-8(a)(4)(iii), Income Tax Regs., a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is regarded as having a depreciable interest for purposes of the investment credit if "he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least part of the film." In Durkin v. Commissioner, 87 T.C. at 1383-1385, this Court held that the partnerships therein were "lenders" within the meaning of section 1.48-8(a)(4)(iii), Income Tax Regs., because the partnerships could look solely to exhibition or disposition of the movies for repayment of the cash and bona fide promissory notes which they had furnished to Paramount to partially reimburse it for the expenses of producing the movies. In so holding, *468 this Court noted that all payments to the partnerships under the distribution agreements were dependent on movie receipts. Respondent asserts here that petitioners are not entitled to an investment credit with respect to "North Dallas Forty", claiming that the partnership's May 26, 1979, movie purchase agreement was backdated and was actually executed subsequent to the August 3, 1979, date when the movie was placed in service. The Court disagrees. The Court holds that the partnership entered into its transaction to acquire its interest in the movie on May 26, 1979. A number of witnesses credibly testified that this was the date on which Paramount, Film Writers, and Regina Associates closed on their respective transactions involving "North Dallas Forty". Their testimony was amply corroborated by various records, including canceled checks, notarized documents, and recordation statements filed with government agencies. Petitioners are entitled to an investment credit with respect to the movie. Miscellaneous Deductions
Based on the parties' stipulation, the $ 400,000 deducted by Regina Associates on its 1979 information return as advertising expenses should have been capitalized *469 and added to the partnership's basis for its interest in the movie. As to the disputed interest expense, the $ 122,317 payment was purportedly interest on the partnership's $ 9.199 million convertible recourse note. As discussed above, the $ 9.199 million note was not a bona fide indebtedness. Accordingly, the $ 122,317 payment should be capitalized as part of Regina Associates' basis for its interest in the movie. As to the partnership's disputed deductions for office and administrative expense, taxes, and professional fees, because Regina Associates was engaged in an activity for profit, these expenses are allowable deductions to the partnership. Partnership's Basis for Its Interest in the Movie
Regina Associates acquired the movie for $ 11,770,000. Of this amount, $ 9,199,817 represented by the long-term nonrecourse note is excludable from basis for the reasons discussed above. That leaves a balance of $ 2,570,183, which consisted of cash and short-term notes: Cash paid 5/26/79
$    25,000
Cash paid 12/3/79
743,183
Short-term note due 3/15/80
1,802,000
Total
$ 2,570,183
In addition, the following additional amounts increase the partnership's basis: *470 Payment of interest on the $ 9.199 million note
$ 122,317
Advertising expenses (per parties' stipulation)
400,000
Total additional amounts
$ 522,317
All of these items, therefore, total $ 3,092,500. Respondent contends that basis should be limited to the actual cash payments by the partnership plus the two items making up the $ 522,317 shown above. As argued by respondent, the partnership's basis is as follows: Cash Payments:
5/26/79
$  25,000
7/26/79
425,000
12/3/79
318,183
$ 768,283
Interest & advertising expenses
522,317
Cash payment during 1980
1,084,274
Basis
$ 2,374,874
The difference between the $ 2,374,874 acknowledged by respondent and the amounts making up the $ 3,092,500 represent payments which were made or credited to Regina Associates from the gross receipts received by Paramount as distributor of "North Dallas Forty". Since Regina Associates owned a gross receipts and net profits participation interest in "North Dallas Forty", the amounts applied by Paramount as a credit to the obligations of Regina Associates constitute payments by Regina Associates in the purchase of its movie interest. Therefore, the basis for the *471 interest of Regina Associates in the movie is determined to be $ 3,092,500. Additions to Tax
Section 6653(a)(1) provides for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for an addition of 50 percent of the interest on that portion of the underpayment attributable to negligence. Negligence under section 6653(a)(1) and (2) is the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The addition to tax under section 6653(a)(1) and (2) was determined in the notices of deficiency against petitioners Richard K. and Lois L. Janger for their 1981, 1982, 1983, and 1984 tax years. The notices of deficiency for 1979 and 1980 did not determine this addition to tax. With respect to petitioners Alan F. and Kathleen W. Segal, the addition to tax for negligence was determined only in the notice of deficiency for their *472 1982 tax year. The notices of deficiency for 1979, 1980, and 1981 did not determine the addition. Although respondent filed amended answers in these cases alleging additional facts and asserting another addition to tax and additional interest, this addition to tax was not asserted as to these other years. The Court notes that the transaction in this case was not a sham and, indeed, had substantial economic and business purposes. Although respondent asserted that the activity was not engaged in for profit, this Court concludes that the burden of proof was not carried by respondent. Moreover, this Court concludes that petitioners are entitled to amortization deductions as well as investment credit for their gross receipts and net profits interest in "North Dallas Forty". The record shows that petitioners had previously invested in other movies prior to the years at issue, and some of these investments had been profitable. They were advised in all of these investments by their law partner, Mr. Eisenberg, who was a knowledgeable and skilled tax attorney. Mr. Eisenberg testified that he was quite cognizant at the time the transactions at issue were entered into of the very questions *473 respondent raised and, indeed, he and his partners had been audited in prior years on many, if not all, of their investments. He understood the law and attempted to structure the transactions to satisfy the requirements of the Internal Revenue Code. Respondent, of course, disagreed that the transactions fully satisfied the internal revenue laws and, to a significant extent, this Court has sustained respondent. Reasonable minds can have reasonable differences of opinion, and the fact that one or the other or both may be incorrect is a far cry from a conclusion that the opinion which is in error constitutes an opinion which negligently or intentionally disregarded the rule of law. Petitioners, therefore, should not be penalized, even though the Court has decided several significant issues against them. Petitioners, therefore, are not liable for the additions to tax under section 6653(a)(1) and (2) to the extent the underpayments in tax are attributable to petitioners' interests in Regina Associates. Section 6659 provides for an addition to tax for underpayments of tax attributable to valuation overstatements. A valuation overstatement exists, among other situations, if the adjusted *474 basis of property claimed on any return equals or exceeds 150 percent of the correct amount of the basis. No addition is imposed under section 6659 unless the underpayment in tax attributable to the valuation overstatement is at least $ 1,000. The addition to tax under section 6659 was not determined in the notices of deficiency sent to petitioners for any of the years at issue. However, respondent filed amended answers in these cases and asserted the addition to tax under section 6659 for the 1981 and 1982 tax years of petitioners Alan F. and Kathleen W. Segal, and for the 1981, 1982, 1983, and 1984 tax years of petitioners Richard K. and Lois L. Janger. As to those years in which this addition to tax has been asserted in amended answers, the burden of proof is on respondent. Rule 142(a). On this record, the Court holds that respondent has not sustained the burden of proof. Accordingly, petitioners are not liable for the section 6659 addition to tax. Respondent determined that Mr. and Mrs. Segal and Mr. and Mrs. Janger are liable for an addition to tax for substantial understatement under section 6661, equal to 10 percent of the underpayment attributable to the understatement *475 for their 1982 tax year. [9] Respondent further determined that Mr. and Mrs. Janger are liable for additions to tax for substantial understatements under section 6661, equal to 25 percent of the underpayment attributable to such understatements for each of their 1983 and 1984 tax years. In order for an understatement of tax to be considered substantial, the amount must exceed the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). *476 Respondent contends that the additions under section 6661 should be imposed because, under section 6661(b)(2)(B)(i) and (ii), there was no substantial authority supporting the claimed treatment of the disallowed items, and because petitioners did not adequately disclose on their returns the relevant facts concerning the disallowed items. Petitioners argue that, even if they are otherwise determined to be liable for the section 6661 additions to tax, respondent should have waived the additions. Petitioners have not established that they had substantial authority supporting their treatment of the disallowed items, nor did they adequately disclose on their returns the relevant facts affecting the treatment of the disallowed items. They further have not shown that they reasonably believed their treatment of the disallowed items was more likely than not the proper treatment. Petitioners have not established that respondent's discretion was abused in not waiving the section 6661 additions to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). Assuming the section 6661(b)(1)(A) threshold amount is met, Mr. and Mrs. Segal are liable for the section 6661 *477 addition to tax for 1982 and Mr. and Mrs. Janger are also liable for the section 6661 additions to tax for 1983 and 1984. Section 6621(c) provides for an increased rate of interest with respect to any "substantial underpayment" of tax in any taxable year "attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000." Section 6621(c)(3)(A) enumerates the types of transactions which constitute "tax motivated transactions": (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in substantial distortion of income for any period, and (v) any sham or fraudulent transaction. [10]
Section 6621(c) applies only with respect to interest accruing after December 31, 1984, even though the tax-motivated transaction was entered into prior to the date of the enactment of section 6621(c). Cherin v. Commissioner, 89 T.C. 986 (1987). *478 In Bailey v. Commissioner, 90 T.C. 558 (1988), affd. in part, vacated in part, and remanded without discussion of this issue 912 F.2d 44 (2d Cir. 1990), a case involving two movie transactions with facts strikingly similar to this case, where the taxpayers claimed depreciation and investment credit on their interests in movies based on the total purchase price of the movies including nonrecourse debt which was found not to be includable in basis, this Court held that the underpayment in tax attributable to the disallowed depreciation was a tax-motivated transaction attributable to a "valuation overstatement" under section 6621(c)(3)(A)(i). Bailey v. Commissioner, supra at 627. In that case, respondent had not sought imposition of the addition to tax under section 6659(a).[11] Also, in Bailey v. Commissioner, supra, this Court disallowed the taxpayers' claimed deductions for interest paid on the nonrecourse notes executed in connection with the purchase of the movies. Because the nonrecourse debt was not bona fide, this Court held that debt which was not bona fide was a sham within the meaning of *479 section 6621(e)(3)(A)(v) and, therefore, the underpayment in tax attributable thereto was subject to the increased interest rate under section 6621(c). Bailey v. Commissioner, supra at 628. Petitioners stipulated that $ 400,000 which had been claimed by Regina Associates as advertising expense was not deductible and should be capitalized as part of the basis or cost of "North Dallas Forty". In connection with section 6621(c)(3)(A)(iv), the Secretary has promulgated temporary regulations which prescribe accounting methods that may "result in a substantial distortion of income." Sec. 301.6621-2T, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). In the question and answer format *480 of these temporary regulations, Question 3 provides: What accounting methods may result in a substantial distortion of income for any period under * * * [sec. 6621(c)(3)(A)(iii)]? The answer to this question is: A deduction or credit disallowed * * * in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment: * * * (9) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because (i) the expenditure resulting in the deduction was a deposit rather than a payment, (ii) the expenditure was prepaid for tax avoidance purposes and not for a business purpose, or (iii) the deduction resulted in a material distortion of income (see, e.g., Rev. Rul. 79-229, 1979-2 C.B. 210). To the extent petitioners deducted advertising expenses which are not allowed as amortization deductions for the years at issue, such amounts not allowable as deductions for said years *481 constitute a material distortion of income within the meaning of section 301.6621-2T, Q & A 3(9)(iii), Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), and the underpayment in tax attributable thereto constitutes a tax-motivated transaction under section 6621(c)(3)(A)(iv). Respondent, therefore, is sustained on the applicability of section 6621(c) to petitioners assuming their respective underpayments for each year attributable to a tax-motivated transaction exceeds $ 1,000. Appropriate orders will be issued.
Footnotes
1. All section references are to the Internal Revenue Code for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. These cases involve the interests of petitioners Alan F. Segal and Richard K. Janger in Regina Associates partnership. Petitioner Alan F. Segal was a direct partner in Regina Associates. Petitioner Richard K. Janger was not a direct partner; however, his 12 grantor trusts were direct partners. The trial of these cases was limited to adjustments relating to Regina Associates and another partnership, Marquis Associates. Shortly after the trial of these cases was completed with respect to Regina Associates, the parties reached a basis for settlement with respect to Marquis Associates. In addition to adjustments relating to these two partnerships, there are numerous other adjustments not related to Regina Associates and Marquis Associates which were not heard and which remain at issue. Kathleen W. Segal and Lois L. Janger are parties to these cases because they filed joint Federal income tax returns for the years in issue.↩
1. 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
1. 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
3. The use of words such as "acquire", "purchase", "sell", and "sale" are for convenience and are not intended as ultimate findings as to the character of the transactions entered into. Similarly, the use of such terms such as "recourse" and "nonrecourse" in connection with promissory notes should not be construed as conveying any conclusion as to the legal effect of the obligations involved.↩
4. Although petitioners contend that Regina Associates remained a general partnership throughout the period of its involvement with the movie it acquired, in all of the agreements, the partnership was recited to be a limited partnership. Additionally, the partnership used letterhead stationery which described Regina Associates as a limited partnership.↩
5. A Paramount executive so testified. He claimed that Paramount was at risk as to 45 percent of the movies' cost and that Film Writers and the partnerships were at risk as to the remaining 55 percent.↩
1. See infra↩ p. 37 itemizing the cash and notes making up the $ 11,570,000. The items on page 37 total $ 11,569,500. The Court assumes the parties rounded off the price to Film Writers at $ 11,570,000.
6. The acquisition agreement required personal guarantees by the partners for 97 percent of the $ 9,199,817 note, which calculates to $ 8,923,822.49. The record is unclear as to why the guarantees executed by the partners exceeded the required amount.↩
7. Although not discussed in this memorandum, Mr. Eisenberg and the partners in Regina Associates were aware that additional fees could be expected from cable television. The sex, nudity, and profanity in the theatrical version of the movie did not present any difficulty for cable television. Further, assuming the movie was successfully edited for network television, later additional license fees might be earned as a result of the movie's being syndicated and licensed for showing on local television stations.↩
8. The term "gross receipts" used throughout this opinion refers to the receipts paid to the distributor and does not relate to the "box office receipts" reported by theaters exhibiting the movie. The gross receipts of the distributor are, therefore, net of the amounts retained by theaters exhibiting the movie.↩
1. Recourse note. ↩
2. Recourse note (also guaranteed by investment company). ↩
3. Fully nonrecourse note.↩
1. Recourse note, convertible to nonrecourse based on movie gross receipts. ↩
9. As originally enacted by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 323(a), 96 Stat. 613, the amount of the addition to tax under sec. 6661(a) was 10 percent of the amount of any underpayment attributable to a substantial understatement. The amount of the addition was increased to 25 percent by the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1951. The amendment made by Pub. L. 99-509, sec. 8002(a), increasing the rate of the sec. 6661(a) addition to 25 percent, applies to all additions assessed after the date of enactment of Pub. L. 99-509. Pallottini v. Commissioner, 90 T.C. 498↩ (1988). Respondent, however, has not sought to increase the sec. 6661(a) additions to tax above the 10 percent amounts set forth in the respective notices of deficiency to the Segals and the Jangers for 1982.
10. Sec. 6621(c)(3)(A)(v) was added by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750.↩
11. The disallowance in this case of the addition to tax under sec. 6659(a) is not based on the fact that the valuation overstatement did not meet the percentage requirement of sec. 6659(b); rather, the disallowance is based upon respondent's failure to sustain the burden of proof.↩